UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTER ASIKA,

          Civil Action No. 15-CV-12485

    Plaintiff,

vs.                                 HON. BERNARD A. FRIEDMAN

WAYNE STATE UNIVERSITY,

    Defendant.
_____/

## AMENDED OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This matter is now before the Court on defendant's motion for summary judgment [docket entry 16]. Plaintiff has filed a response, and defendant has filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing.

Plaintiff brings four claims of racial discrimination and retaliation under, respectively, 42 U.S.C. § 2000d, Title VI of the Civil Rights Act, and MICH. COMP. LAWS ("MCL") § 37.2101 (2016), the Elliott-Larsen Civil Rights Act. Plaintiff alleges that clinical nursing faculty and clinical preceptors were biased against her on account of her race and that the nurse practitioner program at Wayne State has a history of discrimination against African American students. Plaintiff is requesting punitive damages and future economic damages, in addition to costs, interest and attorney's fees.

### II.    FACTS

In the fall of 2012, plaintiff enrolled in Wayne State University's nurse practitioner program, specializing in pediatric primary care. The nurse practitioner program is a

graduate level program that requires a bachelor's degree in nursing. The program is divided into an in-class portion and a practical portion. In the practical portion, the student works at a clinical site with a practicing nurse practitioner who has volunteered to serve as the student's preceptor. Failure in either portion results in a failure for the class as a whole.

Plaintiff began the program's clinical portion in the fall of 2014 with class NUR 7225. Plaintiff was assigned to Ms. Quiana Stephens-Mack, an African American woman, as her preceptor, and Ms. Heather Bartlett served as her faculty advisor. Def.'s Mot., Ex. D. Plaintiff successfully completed both portions of NUR 7225, attributing part of her success to Ms. Bartlett. *Id.* Plaintiff praised Bartlett in an email, stating: "the fact that I know you want me to succeed encourages me to work harder and not give up. Thank you for your kindness." *Id.*

In early 2015, plaintiff enrolled in NUR 7226. Def.'s Mot., Ex. E. Bartlett again served as plaintiff's faculty advisor, and Joanne Howard served as plaintiff's preceptor. *Id.* Plaintiff was assigned to the pediatric primary care clinic at Detroit Medical Center Children's Hospital. *Id.* Plaintiff had previously requested this assignment and, at first, plaintiff enjoyed herself. *Id.* Plaintiff got along well with Howard, and she wrote in her first clinical evaluation:

> I am in a good learning environment. My preceptor [Howard] is really taking out the time to go over documentation with me . . . . I am fortunate to have Joanne as my preceptor. She answers all my questions (which sometimes are too many) and she makes it very easy for me to ask my questions.

*Id.*

On February 12, 2015, plaintiff met with Bartlett again for a performance review. Def.'s Mot., Ex. G. Bartlett and Howard informed plaintiff that they were preparing a performance improvement plan ("PIP") for her due to a number of concerns regarding her basic clinical skills. *Id.* Howard listed her concerns in an email to Bartlett. *Id.* Although Howard

2

considered plaintiff to be a "lovely person" who worked hard and was well liked, Howard felt that plaintiff lacked the skills necessary for success in the course.[1]  *Id.*  For example, when plaintiff was examining a patient with a condition known as "situs inversus," where the major organs are located on the opposite side of the body, plaintiff simply noted, "normal heart sounds."  *Id.*  Further, this patient had a particular type of skin condition, which appeared in specific places; plaintiff wrote "rashes" without indicating the type of rash, its appearance, or location.  *Id.*  Howard later wrote that, without close supervision, the plaintiff could not work in the clinic as a nurse practitioner student.  *Id.* at Ex. H.  Plaintiff, who already knew a PIP was being prepared for her, was asked to not return to the clinic until the PIP had been prepared and she met with her supervisors.  *Id.* at Ex. G.

On February 16, 2016, after plaintiff received Howard's review, plaintiff raised allegations of discrimination in an email sent to Howard, Bartlett, Mack, Dr. Nantais-Smith (the nurse practitioner program director), Ms. Rose Williams (plaintiff's sister and an attorney), and the nurse coordinator for plaintiff's clinic.  Def.'s Mot., Ex. I.  In this email, plaintiff told program faculty (for the first time) about prejudices she felt she faced and claimed to have spoken to four other students with "similar bad situations."  *Id.*  Plaintiff insinuated that these situations occurred because the students were African American and female.  *Id.*  Notably, plaintiff also felt that it was unjust to hold her to graduate-level standards, stating: "I should not be compared to other students because we all come with different expertise and experiences.  *It is unfair to expect me to perform at the same level with another student* who has worked in a Pediatric [sic] setting before."  *Id.* (emphasis added).  Plaintiff later testified that her performance was being held to the program's normal standards, and that this was "unfair."  *See* Pl. Dep., p.

---

[1] For example, plaintiff entered the clinic not understanding vaccine schedules, basic infant care, or early childhood development.  *Id.*

3

116. Finally, plaintiff wished to attend future meetings with her counsel present, and she requested that the meeting to discuss her PIP be rescheduled for the convenience of herself and counsel. Def.'s Mot. Ex., I. That same day, plaintiff contacted counsel seeking representation on her discrimination claim. Pl.'s Resp., Ex. 2.

Shortly after receiving plaintiff's email, Dr. Ramona Benkert, the Interim Associate Dean for Academic and Clinical Affairs for the Wayne State College of Nursing, responded by an email co-signed by Nantais-Smith. Def.'s Mot., Ex. J. Dean Benkert did not admit to plaintiff's claims, but suggested that plaintiff file a complaint with the university's Office of Equal Opportunity, *id.*, which plaintiff never did, Pl.'s Dep., 144. Dr. Benkert also transferred plaintiff to a different clinical site—the Beaumont Hospital Neurology Clinic—where Anne Marie Michon served as plaintiff's preceptor and Dr. Sarah LeRoy served as her clinical faculty member. Def.'s Mot., Ex. J.

On plaintiff's first day at Beaumont, March 2, 2015, Michon noted that plaintiff's non-verbal signals indicated that plaintiff did not want to be there. Def.'s Mot., Ex. M. Over the next six weeks, plaintiff's performance deficiencies appeared often, and included choppy presentations, slow and faulty examinations, and a lack of prerequisite knowledge. Once, a patient accused her of sleeping during an examination. *Id.* Michon graded plaintiff as "minimally satisfactory," and when these issues were brought up to plaintiff, she became defensive. *Id.*

Plaintiff's poor performance continued until her final day at the Beaumont clinic on April 15, 2015, when she made a number of serious errors. Michon Aff., ¶ 9. While examining a child patient, plaintiff was asked to identify and explain a "café au lait" birth mark. *Id.* In front of the child's mother, plaintiff stated that that it could indicate child abuse; this

4

demonstrated poor judgment and upset the child's mother. *Id.* Later that day, plaintiff struggled to calculate a proper dosage for Tylenol and Motrin, and it took her several attempts over an extended period of time to come to the correct answer. *Id.* at ¶ 10.

This error-filled day finished with the discharge of a particularly difficult patient who required the care of Michon and two neurologists. *Id.* at ¶ 11. Having been present during the complicated exam, plaintiff should have understood the difficulties this patient presented. *Id.* As Michon helped the wheelchair-bound patient to his vehicle, plaintiff interrupted several times, asking to leave the clinic for the day. *Id.* Due to plaintiff's persistence, the patient's father offered to wait while Michon spoke to plaintiff. Def.'s Mot., Ex. M. Michon told the patient's father that plaintiff would wait because patients are a top priority. *Id.* Once Michon discharged the patient, she attempted to discuss the April 7, 2015, evaluation with plaintiff. *Id.* Plaintiff disagreed with Michon about plaintiff's low scores and left the clinic refusing to sign the evaluation. *Id.* On April 21, 2015, Michon plaintiff's final evaluation, detailing all of plaintiff's deficiencies and concluding that plaintiff is unsafe to practice in a clinical setting. Def.'s Mot., Ex. R.

Plaintiff then initiated this action on June 13, 2015, arguing an intentional violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d; intentional violation of the Elliott-Larsen Civil Rights Act, MCL 37.2101; retaliation under Title VI of the Civil Rights Act; and retaliation under the Elliott-Larsen Civil Rights Act. Compl. ¶¶ 8, 14, 17, 20. Plaintiff seeks damages in the form of loss of future income, emotional distress, and punitive damages, in addition to costs, interest, and attorney's fees. *Id.*

### III. DISCUSSION

A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325). Once the moving party has met its initial burden, the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

B. <u>Analysis</u>

      i. *Counts 1 and 3: Racial Discrimination Under Title VI of the Civil Rights Act and the Elliott-Larsen Civil Rights Act*

Title VI states that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "The same standards apply to claims of race discrimination brought under . . . Title VI[] and Michigan's Elliott–Larsen Civil Rights Act." *Crane v. Mary Free Bed Rehab. Hosp.*, No. 1:13-CV-1294, 2015 WL 10791897, at *4 (W.D. Mich. Mar. 13, 2015), aff'd, 634 F. App'x 518 (6th Cir. 2015). "Title VI targets intentional discrimination only. . . . [C]onclusory allegations of race discrimination are insufficient. [A] complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief." *Foster v. Michigan*, 573 F. App'x 377, 388 (6th Cir. 2014) (quotation marks omitted).

Plaintiff has not established a prima facie case of racial bias. Plaintiff suffered numerous performance deficiencies, and the record shows that she was placed on a PIP and later dismissed from the program due to poor performance, not racial bias. Initially, plaintiff felt that she was in a positive, supportive learning environment in NUR 7226. She felt "lucky" to have Howard as her preceptor, and described Bartlett as supportive and encouraging. Plaintiff first complained of discrimination after a negative evaluation; in plaintiff's February 26, 2016 email, she mentions alleged racial bias, but she provided no facts or concrete examples of her supervisors' behavior from which racial bias could be inferred.

In response to plaintiff's email, Benkert encouraged plaintiff to file a complaint with the university's Equal Opportunity Office, and plaintiff was moved to a new clinical site at Beaumont Hospital with a new clinical preceptor and faculty member. Def.'s Mot. Ex. J. By

moving plaintiff to a new clinical location overseen by different supervisors, the program undertook prompt remedial action, which is a defense to plaintiff's Title VI and Elliott-Larson claims. *See Chambers v. Trettco,* 463 Mich. 297 (2000).

Some of plaintiff's arguments and evidence of unfair treatment do nothing to show racial bias. For example, plaintiff claims that her replacement preceptor, Michon, was biased against her because of Michon's friendship with Bartlett and Howard. Pl.'s Dep. 115–16. Unfair treatment based on Michon's friendship would not help prove plaintiff's prima facie case of racial discrimination. Plaintiff also claims that she was discriminated against because she hired an attorney to represent her during meetings with program faculty. Even if this claim is taken as true, it is not racial discrimination. Plaintiff also claims that she overheard two instructors "plotting to remove her from the program" shortly before her dismissal. Pl.'s Resp., p. 12. She alleges that, in this conversation, her instructors were attempting to "bully" her, and that they were looking for an excuse to remove her from the program. *Id.* at Ex. 4. Plaintiff does not claim that race was implicated in this conversation. Even if these facts occurred as plaintiff alleges, they do not show an intent to discriminate based on race.

Plaintiff's only evidence of racial discrimination is the stories of other African American students that she alleges were, like her, failed the program because of their race. She mentioned them in her initial email to the university, stating: "could it be a coincidence that those 4 other students are female just like me as well as African American Students? [sic] I am not one to play the race card but something does not seem right here and should not continue to be a trend." Def.'s Mot., Ex. I. Plaintiff fails to describe what racially motivated treatment these four other students received. And although plaintiff presents emails between her and her counsel in which she discusses these other students, Pl.'s Resp., Exs. 1, 4, 6, these emails are conclusory,

8

devoid of any factual material, and cannot be considered by the Court because they would be inadmissible hearsay if offered at trial. *See Tranter v. Orick*, 460 F. App'x 513, 515 (6th Cir. 2012) (holding that the Court should only consider evidence admissible at trial when deciding a motion for summary judgment).

Plaintiff also has submitted affidavits from Quiana Mack and Gail McDowell, two of the four individuals who plaintiff alleges suffered discrimination. Mack testified that she felt discriminated against based on her race, and that white students were evaluated using a different standard. *Id.* at Ex. 8. However, Mack does not allege specific actions, instances, or statements from the program or its faculty to support these claims. *Id.* Similarly, McDowell's affidavit does not state any admissible facts which could give rise to an inference of racial discrimination. *Id.* at Ex. 9.

Even if the Court could consider the evidence of these other students, it is insufficient to establish a prima facie case. To establish plaintiff's prima facie case, these students must be similarly situated and have suffered the same treatment as plaintiff. To be similarly situated, the plaintiff must be able to point to individuals with whom she is nearly identical on all relevant aspects. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). These students are not similarly situated, nor did they have a similar outcome to plaintiff. Plaintiff alleges that Mack failed the program, which is contradicted by Mack's own testimony. Plaintiff does not know what class Mack failed, whether it was the clinical or academic portion, or who her preceptor or faculty member were. Mack testified that she failed a class, but Mack was allowed to retake it. *See* Quiana Mack's Aff., p. 1. Plaintiff has no other example of Mack being treated negatively. Pl. Dep., p. 121. In fact, Ms. Mack was later selected by the Nurse Practitioner program to serve as plaintiff's preceptor in NUR 7225.

9

Ms. Fatima May, identified by plaintiff as similarly situated, failed one of her clinical courses, but was also allowed to repeat the course. Plaintiff does not know who failed May or which course May failed. The fact that Mack and May were allowed to retake their failed classes and subsequently completed the program is enough to distinguish them from the plaintiff.

ii. *Counts 2 & 4: Retaliation Under Title VI and Elliott-Larsen*

To successfully show retaliation under Title VI and Elliott-Larsen, plaintiff must prove that: (1) she engaged in a protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant took adverse action against the plaintiff following this protected activity, and; (4) there was a causal connection between the protected activity and the adverse action. *BBF Eng'g Servs., P.C. v. Michigan*, No. 11-14853, 2012 WL 380282, at *6 (E.D. Mich. Feb. 6, 2012), aff'd sub nom. *Foster*, 573 F. App'x at 377. In other words, plaintiff must show that the email was a protected activity; that the individuals who decided to dismiss her from the program were aware of it; and that there is a causal connection between the email and her removal from the program. *See Walborn v. Erie Cty. Health Care Facility,* 150 F.3d 584 (6th Cir. 1998).

Although plaintiff's email may be a protected activity and plaintiff was terminated after she sent the email, plaintiff points to no evidence to establish the causal relation between her email and her termination. After sending the email, plaintiff was transferred to Beaumont and began working with Michon. However, there is no evidence showing that Michon was even aware of the email, and plaintiff testified that she does not know if Michon was aware. Pl.'s Dep. 307–08. If Michon had no knowledge of the email, she cannot have retaliated against plaintiff for it. Without evidence that Michon knew of plaintiff's email,

10

plaintiff fails to show that there is genuine dispute as to the fourth element. *See Walborn*, 150 F.3d at 588–89 (finding that the plaintiff had no evidence showing that the adverse action was linked to the protected action). Further, because the alleged discrimination began before plaintiff took the protected action—i.e., sending the email—plaintiff's retaliation similarly fails. *Id.* at 589.

Indeed, the heart of plaintiff's problems seem to be not retaliation but, in her own words, that she considers it "unfair to expect [her] to perform at the same level with another student." Def.'s Mot. Ex. I; Pl.'s Dep., p. 116. Therefore, Counts 2 and 4 are dismissed.

C. Damages

Punitive damages are not available under Title VI, and plaintiff is not entitled to future economic damages because she failed to mitigate. *Barnes v. Gorman*, 536 U.S. 181, 181 (2002); *Morris v. Clawson Tank*, 459 Mich. 256, 263 (1998). Plaintiff was accepted to two other nurse practitioner programs but declined to attend either. Although she briefly began taking classes at a different university, plaintiff dropped out very shortly thereafter. Pl. Dep. 310. Thus, even if plaintiff did succeed on her claims, she is not entitled to punitive or future economic damages for loss of future income.

IV. CONCLUSION

Plaintiff has not shown that there is a genuine dispute as to any material fact in her prima facie case of race discrimination; plaintiff's "race-discrimination claims consist of nothing more than legal conclusions." *Foster*, 573 F. App'x at 388. Plaintiff has failed to establish a prima facie case for retaliation because she does not know whether the faculty members at her new clinical site were even aware of the email and, thus, has not shown a genuine issue as to the causal link between her email and her dismissal from the program. In

sum, plaintiff has not produced any evidence showing that any university decision was motived by race. Accordingly,

        IT IS ORDERED that defendant's motion for summary judgment is granted.


        _s/ Bernard A. Friedman_____
        BERNARD A. FRIEDMAN
        SENIOR UNITED STATES DISTRICT JUDGE

Dated: October 21, 2016
      Detroit, Michigan